## ERIE R. CO. v. VAN BUSKIRK.

(Circuit Court of Appeals, Third Circuit. July 10, 1924. Rehearing Denied September 23, 1924.)

No. 3026.

**Master and servant** ⬤⟲**284(1)—Engine hostler's employment in interstate commerce held for jury.**

In action under federal Employers' Liability Act for death of engine hostler, killed while assisting in moving bucket, whether it obstructed track, and whether decedent's purpose in assisting in moving it was to clear track, so that he might move engine thereon, so that he

was engaged in interstate commerce at time of death, *held* questions for jury.

Woolley, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit by Elmira Van Buskirk, administratrix, against the Erie Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Edward A. Markley, of Jersey City, N. J., and George S. Hobart, of Newark, N. J., for plaintiff in error.

Frank F. Davis and John C. Oldmixon, both of New York City, for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge. In this suit there have been three trials by jury, and it is now before this court for the third time upon a writ of error. The suit was brought by the administratrix of the estate of William Van Buskirk to recover damages under the federal Employers' Liability Act of April 22, 1908 (Comp. St. §§ 8657–8665), for the pecuniary loss sustained by her as the widow of the intestate, caused by his death on October 27, 1913, through alleged negligence on the part of the Erie Railroad Company or its servants while Van Buskirk was in its employ as an engine hostler in its terminal yard at Jersey City, N. J. The third trial resulted in a verdict for the plaintiff, and upon the judgment entered upon that verdict a writ of error was sued out by the defendant, plaintiff in error.

The facts relating to the nature of the employment of Van Buskirk, the description of the location, and the manner in which the accident occurred have been so fully stated in the opinions on the prior writs of error (see Erie Railroad Co. v. Van Buskirk, 228 Fed. 489, 143 C. C. A. 71, and Van Buskirk v. Erie Railroad Co. [C. C. A.] 279 Fed. 622) that a detailed restatement would be superfluous. Evidence upon the prior trials was held sufficient to show that the engine under Van Buskirk's charge as hostler was an instrumentality of interstate commerce, being employed indiscriminately in shifting cars used in interstate and intrastate commerce, and that his employment in taking charge of the shifting engine in the interval between the completion of one day's work and the be-

ginning of another day's work, in taking it to the ash pit to be cleaned of ashes and supplied with coal, and taking it to the respective points for its supply of sand and water, was employment in interstate commerce; and the evidence at the third trial upon those points is substantially identical with that at the former trials.

The main issue on all three trials has been whether there was evidence from which a jury could find that, at the time of the accident through which Van Buskirk met his death, he was employed in interstate commerce or in work so directly and immediately connected with interstate commerce as to form a part thereof. New York Central & Hudson River Railroad Co. v. Carr, 238 U. S. 260, 35 Sup. Ct. 780, 59 L. Ed. 1298. The evidence upon the trial, concerning which there is no dispute, is that Van Buskirk had taken the shifting engine upon the ash pit track for the purpose of having the ashes removed; that the next operation after the cleaning of ashes was to have the engine supplied with coal. This was done by means of a "Brown" hoist. The supply of water and sand was located beyond the end of the "Brown" hoist siding. The "Brown" hoist was at that time engaged in moving a clam shell bucket from a point adjacent to a shanty located near the end of the "Brown" hoist siding and so placing it that it could later be placed upon a flat car for removal to the railroad company's Croxton yards. The work of removing the bucket to the Croxton yard was admittedly not a part of interstate commerce. The "Brown" hoist, which operated upon a siding parallel with and so adjacent to the ash pit track as to enable it to be used in hoisting coal from cars upon a track on the side of the "Brown" hoist siding opposite the ash pit track and dumping it into the engines on the ash pit track, was supplied with a clam shell bucket. To this bucket the employees engaged in moving the bucket to be taken to the Croxton yards attached the latter by means of a chain. When this attachment was made, the bucket to be moved was lifted to a height of about a foot, swung away from the shanty, and lowered to the ground.

The evidence tended to show that, having been lowered to the ground, it was so placed as to obstruct the passage of an engine moving upon the ash pit track; that, upon discovering this fact, the operator of the "Brown" hoist, at the request of the employee having in charge the moving of the bucket, again lifted it for the purpose of moving it away from the obstructed track.

There was evidence tending to show that, while this second movement of the "Brown" hoist and the clam shell bucket was taking place, Van Buskirk, having left his engine, came up and said, "What are you trying to do there?" and assisted two other employees, who were on the ground, in steadying the bucket with his hands, while it was being moved to a position which would clear the track. It is uncontradicted that, while the bucket being lifted was still in the air, the bucket of the "Brown" hoist, which was above the other bucket and sufficiently high in the air to be above the heads of the men steadying the lower bucket, suddenly descended, and that Van Buskirk was caught beneath it and killed.

It is contended on the part of the defendant in error that, if the decedent was engaged in that work, and its purpose was to clear the track on which his engine stood, and enable him, after coaling it, to move it to where it would be supplied with sand and water, and thereby to complete his work as hostler in fitting it for further use in interstate commerce, he was engaged, during such employment, within the meaning of the federal Employers' Liability Act, in interstate commerce. This theory of the case was not presented or urged upon either of the previous writs of error. It was, however, raised at the trial now under consideration, and the trial judge under pertinent instructions left the question to the jury.

Charles Henke, a witness for the plaintiff, who operated the "Brown" hoist, testified:

"Q. Now, how far from the ground did you have that second bucket lifted when it was at its highest point? A. Oh, I dare say no more than a foot at any time.

Q. And then what happened to that bucket, if anything, while it was that high in the air? A. Why, as I say, I swung it over near the ash pit track.

"Q. Yes. A. (continued) And lowered it for him there, and he said the bucket was too close.

"Q. Yes. A. So I had to pick it up once more.

"Q. Now, just a minute. Pardon me for interrupting you, Mr. Henke. You took it up in the air, and then where did you lower it, Mr. Henke? In other words, how far did you move it before you lowered it? A. Why, I moved it very near to the ash pit track.

"Q. Well, then that would be somewhere in the neighborhood of where my pencil is (indicating)? A. Yes.

"Q. So it would be a swing of about how many feet before you let it down again? A. Oh, probably 8 feet.

"Q. Did it, at any time, when you let it down, after first raising it, get upon the ash pit track? A. Well, it got so close to it that we were afraid an engine wouldn't pass.

"Q. That means to the first rail that you would come to? A. Yes.

"Q. And then what was the next operation, when you found that it seemed to be too close to that track? A. He requested me to raise it once more, in order to swing it a little further away.

"Q. Yes; that meant swinging it beyond the ash pit track, or back toward the shanty? A. Back toward the shanty."

Fred H. Kruger, a witness for the defendant, who had charge of the moving of the bucket to the Croxton yard, testified:

"Q. Now, then, as I understand it, the buckets were lifted in the air, then, weren't they? A. Yes, sir.

"Q. And where were they put the first time they were lifted from the position near the shanty? A. I asked Henke to lift it up and bring it over a bit.

"Q. Well, did he do that? A. He done that.

"Q. Now, where did the bucket come down? A. Then I told him to lower, and he put them too close to that ash pit track.

"Q. Then they came down near the ash pit track? A. Yes, sir.

"Q. The bucket was not between the rails of the ash pit track? A. No, sir. * * *

"Q. And then what happened? What was done next? A. I asked him to lift up again, to push her a little more north, so the locomotive could have clearance to pass.

"Q. Yes. A. Which he done.

"Q. And it was while he was doing that movement that the accident happened? A. Yes, sir.

"Q. Now, did you see Van Buskirk there before the accident? A. Yes; I did.

"Q. Did you see Maloney there before the accident? A. I don't—I didn't see Maloney, all I seen was his hands; but I wouldn't say whether it was Maloney or not; I know it was immediately after the accident.

"Q. Now, did Van Buskirk do anything there to help you with the bucket? A. Well, as I was trying to steady the buckets, Mr. Van Buskirk came, and he says to me, 'What are you trying to do there, Fritz?'

"Q. Yes. A. (continued) If I remember well, or did he say, 'Good morning, Fritz;' but I think it was, 'What are you trying to

do there?' and he was putting his hands on-to it, and, if I remember well, so did Maloney.

"Q. Were they on the same side of you, or were they on each side of you, or how? A. One on each side.

"Q. And they both had hold of the bucket with you? A. Yes, sir; trying to give me a hand.

"Q. Had you asked them to help you? A. No, sir.

"Q. What were you doing there, as the Brown hoist was lifting the bucket; what was your job? A. I had my hands onto it.

"Q. What was the purpose of putting your hands on there? A. Trying to straighten out the bucket.

"Q. Straighten out the bucket for what purpose? A. To make clearance with the track. * * *

"Q. Did the bucket come down all right? A. Yes; my bucket was lying on the ash pit track; that is, the bucket I was taking the yoke from; then I asked him to lift it up again, push it over a little further, so the engine could pass.

"Q. When it first came down, it was probably on the track? A. No, sir; an engine wouldn't pass; so I asked him to lift it again, and I had the bucket up, and I seen him, after he lifted it up—I didn't see Maloney, but I seen Van Buskirk; he asked, 'What are you trying to do there?' I seen him coming, but I wanted that bucket down first, before I could speak to him."

Re-cross examination by Mr. Davis:

"Q. I want to ask you this, so that there will be no mistake about it: When you said it was too near the track in your judgment for an engine to pass, you mean the ash pit track? A. When it was first lowered; yes, sir."

This and other evidence to the same effect was clearly sufficient to go to the jury as tending to show that the bucket, when first lowered, obstructed the ash pit track, so that Van Buskirk's engine could not pass for its supply of water and sand to fit it for further use in interstate transportation.

The case is quite similar in principle to that of Southern Railway Co. v. Puckett, 244 U. S. 571, 37 Sup. Ct. 703, 61 L. Ed. 1321, Ann. Cas. 1918B, 69, where, while a car inspector was waiting for cars which were to be placed in an interstate train, a collision occurred between cars, blocking tracks over which the interstate train was to run. One of the railway company's employees was caught in the collision and pinned beneath a car. Puckett helped in the

task of raising the wrecked car to rescue the employee, and coincidentally to clear the track for interstate commerce, and was injured while carrying blocks on his shoulder to jack up the wrecked car and replace it upon the track. In Mr. Justice Pitney's opinion he says:

"The court held that, although plaintiff's primary object may have been to rescue his fellow employee, his act nevertheless was the first step in clearing the obstruction from the tracks, to the end that the remaining cars for train No. 75 might be hauled over them, that his work facilitated interstate transportation on the railroad, and that consequently he was engaged in interstate commerce when injured. We concur in this view. From the facts found, it is plain that the object of clearing the tracks entered inseparably into the purpose of jacking up the car, and gave to the operation the character of interstate commerce. The case is controlled by Pedersen v. Delaware, Lackawanna & Western R. R. Co., 229 U. S. 146, 152; New York Central & Hudson River R. R. Co. v. Carr, 238 U. S. 260, 263; Pennsylvania Co. v. Donat, 239 U. S. 50; Louisville & Nashville R. R. Co. v. Parker, 242 U. S. 13. Pedersen v. Delaware, Lackawanna & Western R. R. Co., supra, holds that a workman employed in maintaining interstate tracks in proper condition while they are in use is employed in interstate commerce; the other cases are to the effect that preparatory movements in aid of interstate transportation are a part of such commerce within the meaning of the act."

In the case of Louisville & Nashville Railroad Co. v. Parker, 242 U. S. 13, 37 Sup. Ct. 4, 61 L. Ed. 119, Mr. Justice Holmes said:

"The business upon which the deceased was engaged at the moment was transferring an empty car from one switch track to another. This car was not moving in interstate commerce, and that fact was treated as conclusive by the Court of Appeals. In this the court was in error, for if, as there was strong evidence to show, and as the court seemed to assume, this movement was simply for the purpose of reaching and moving an interstate car, the purpose would control and the business would be interstate. The difference is marked between a mere expectation that the act done would be followed by other work of a different character, as in Illinois Central R. R. Co. v. Behrens, 233 U. S. 473, 478, and doing the act for the purpose of furthering the later

work. See New York Central & Hudson River R. R. Co. v. Carr, 238 U. S. 260, 263; Pennsylvania Company v. Donat, 239 U. S. 50; Kalem Co. v. Harper Bros., 222 U. S. 55, 62, 63."

Under the reasoning of those authorities, the questions whether the purpose of the second lifting of the bucket was to clear the track preparatory for the further movement of Van Buskirk's engine to fit it for further use in interstate commerce, and whether Van Buskirk's action in assisting in that operation by placing his hands upon and steadying the bucket was for that purpose, were properly left to the jury for their determination by the trial judge. While the evidence would have warranted other conclusions, that is immaterial, in view of the verdict.

The questions of the defendant's negligence, of contributory negligence on the part of the decedent, and of assumption of risk were fully covered in the charge, and properly left for the determination of the jury. We perceive no error either in the rulings upon evidence or in the charge.

The judgment is therefore affirmed.

WOOLLEY, Circuit Judge, dissents.